**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAOLEI QIU, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>            v.<br><br>CREDIT SUISSE GROUP AG and JANUS INDEX & CALCULATION SERVICES LLC,<br><br>Defendants. | **Case No. _____**<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shaolei Qiu ("Plaintiff"), by and through his undersigned counsel, except for his own acts, which are alleged based on knowledge, alleges the following on information and belief based upon the investigation by Plaintiff's counsel, including a review of publicly available regulatory filings with the Securities and Exchange Commission ("SEC"), news articles, media reports, and other publicly-available information.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      Plaintiff brings this securities class action on behalf of himself and all other similarly situated investors who purchased or otherwise acquired Credit Suisse Group AG's ("Credit Suisse") VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes ("XIV Notes") from January 29, 2018 through February 5, 2018 (the "Class Period").   At times relevant hereto, the XIV Notes traded on the NASDAQ under the ticker symbol XIV.

2.       Defendants made misrepresentations and omissions of material facts and engaged in a fraudulent course of business in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) in connection with their failure to accurately calculate and report Intraday Indicative Values for the XIV Notes, resulting in the XIV Notes trading at artificially inflated prices during the Class Period.  When Defendants' fraudulent course of conduct came to an end on February 5, 2018, the value of the XIV Notes collapsed, causing Plaintiff and the Class to suffer substantial losses.

## JURISDICTION AND VENUE

3.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act 15 U.S.C. § 78aa.

4.       Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because the acts complained of (including the preparation, issuance and dissemination of materially false and misleading information and Defendants' fraudulent course of business that caused the XIV Notes to trade at artificial prices), occurred in substantial part in this District.

5.       In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the mails and the means and instrumentalities of interstate commerce, including telephonic communications and the Internet.

## THE PARTIES

6.     Plaintiff invested in the XIV Notes during the Class Period, and thus suffered damages.  Attached hereto as Exhibit A is Plaintiff's certification identifying his transactions with respect to the XIV Notes.

7.     Defendant Credit Suisse Group, AG (defined above as "Credit Suisse"), headquartered in Zurich, Switzerland, is a corporation that operates as a holding company. Credit Suisse owns a multinational bank, through which an array of financial services and investment products are offered.  Included among the investment products offered by Credit Suisse are VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes (defined above as the "XIV Notes"), which as discussed in greater detail herein, were subject to liquidation on February 21, 2018.

8.     Defendant Janus Index & Calculation Services LLC ("JIC"), formerly known as VelocityShares LLC until its July 2015 name change, is headquartered in New Canaan, CT.  JIC operates as a subsidiary of VS Holdings Inc.  At all times relevant herein, JIC served as Credit Suisse's agent for purposes of calculating the market valuation mechanism for the XIV Notes. Credit Suisse and JIC are hereinafter sometimes jointly referred to as "Defendants".

## FACTUAL OVERVIEW

### The S&P 500 and SPX Options

9.     The well-known Standard & Poor's 500 Index ("SPX") is a stock index based on the 500 largest companies whose stock is listed for trading on the NYSE or NASDAQ.  Unlike other well-known indices, including the Dow Jones Industrial Average, SPX is a capitalization-weighted index, meaning that the weight of a company in the SPX is equal to its size, as measured by that company's market capitalization, or "market cap".

10.     SPX is widely regarded as the leading benchmark of the overall U.S. stock market.  The Chicago Board Options Exchange ("CBOE") is the exclusive provider of SPX options.  In this regard, CBOE provides a range of SPX options with varying settlement ranges and dates, including A.M. and P.M. settlement, weekly options and end-of-month options.

11.     As with other options, SPX options can be either put or call options.  Briefly, an option contract gives the buyer the right, but not the obligation, to either buy (as is the case with a "call option") or to sell (as is the case with a "put option") a particular commodity or financial instrument at a specified future date ("expiry date") at a predetermined agreed-upon price ("strike price").

***The VIX***

12.     In 1993, the CBOE created a means to measure the near-term expected volatility in the broad equity market, as demonstrated by SPX option prices.  This measure of expected volatility -- known as the VIX Index or simply the VIX -- is sometimes referred to as a "fear index" or "fear gauge."

13.     The VIX tracks higher when the market is anticipating increased volatility, and conversely tracks lower when the market anticipates less volatility in the coming 30-day time frame.

14.     VIX pricing is directly tied to the prices of SPX options, because the prevailing SPX options pricing serves as an indicator of the market's expectations in the future concerning volatility in equity pricing.  On its website, CBOE describes the relationship between the VIX Index and SPX options as follows[1]:

---

[1] Per the CBOE website: http://www.cboe.com/products/vix-index-volatility/vix-options-and-futures/vix-index/vix-faqs#1

The VIX Index is an up-to-the-minute market estimate of implied (expected) volatility that is calculated by using the midpoint of real-time S&P 500® Index (SPX) option bid/ask quotes. More specifically, the VIX Index is intended to provide an instantaneous measure of how much the market thinks the S&P 500 Index will fluctuate in the 30 days from the time of each tick of the VIX Index.

### *VIX Options, VIX Futures and Related Investment Products*

15.     Initially, the VIX acted merely as a benchmark, as investors could not take an investment position on the VIX itself until 2004, when CBOE created VIX futures.   Futures contracts represent a promise, generally made through a futures exchange, to buy or sell a particular commodity or financial instrument, at a predetermined price at some future date. Subsequently, in 2006, CBOE also created VIX options.

16.     Since 2006, VIX futures and options have essentially allowed investors to trade and/or hedge an investment position based on their assessment of future market volatility.

17.     Both VIX futures and options are cash-settled at expiry, as opposed to requiring physical delivery of the underlying commodity.

18.     Following the creation of VIX futures and options, a number of new VIX-centric investment vehicles were created.  These investment products include exchange traded funds ("ETFs") and exchange traded notes ("ETNs").

19.     An ETN is an unsecured debt instrument traded on a major exchange.  ETNs function somewhat like promissory notes, insofar as investors pay money to the institution sponsoring the ETN, and upon maturity, receive money.

20.     Unlike traditional promissory notes, the value of ETNs such as the XIV Notes is derived from a particular market index (here, the VIX), and payment is subject to the creditworthiness of the sponsor issuing the ETN (here, Credit Suisse).

21.     Inverse ETFs or ETNs, as their name implies, are designed to deliver a return to investors that approximates the inverse of the performance on an underlying referenced index. Thus, investors who believe that market volatility will remain muted may be inclined to invest in an inverse VIX-related investment product.  Generally speaking, investors in inverse VIX-related investment products will profit during times of lower volatility (as measured by VIX) and lose money during times of higher volatility.

***Credit Suisse Issues XIV***

22.     In November 2010, Credit Suisse issued its VelocityShares Inverse VIX Short Term ETNs (NASDAQ: XIV).   The XIV Notes were most recently issued by Credit Suisse pursuant to a January 29, 2018 pricing supplement ("January Supplement").

23.     At all relevant times, Plaintiff and each member of the Class purchased XIV Notes pursuant to a registration statement filed by Defendant Credit Suisse with the SEC, in addition to various ancillary prospectuses and pricing supplements, including the January Supplement.[2]

24.     Millions of XIV Notes traded during the Class Period.  The XIV Notes constituted senior unsecured debt obligations of Credit Suisse.

---

[2] The January Supplement (No. VLS ETN-1/A48) was filed with the SEC pursuant to Rule 424(b)(2), in conjunction with Registration Statement No. 333-218604-02 and certain preceding prospectus supplements, to offer 16,275,000 XIV ETNs at $10 each.

## THE XIV REGISTRATION STATEMENT AND JANUARY SUPPLEMENT CONTAIN MATERIALLY FALSE AND MISLEADING STATEMENTS

### *Credit Suisse Discloses Pricing Mechanism to XIV Investors*

25.    As is the case with other exchange-traded securities, XIV's pricing was based to

some degree on market-driven supply and demand.  However, XIV's pricing was also influenced

by a certain formula or pricing mechanism, referred to as the "Intraday Indicative Value,"

derived from the values of the then current 1-month and 2-month VIX futures contracts.  As set

forth in the January Supplement, in relevant part:

> The "Intraday Indicative Value" for each series of ETNs is designed to approximate the economic value of such series of ETNs at a given time. It is calculated using the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time. The Intraday Indicative Value of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor … JIC or its affiliate is responsible for computing and disseminating the Intraday Indicative Value.
>
> The Intraday Indicative Value is a calculated value and is not the same as the trading price of the ETNs and is not a price at which you can buy or sell the ETNs in the secondary market. The Intraday Indicative Value does not take into account the factors that influence the trading price of the ETNs, such as imbalances of supply and demand, lack of liquidity and credit considerations. **The actual trading price of the ETNs in the secondary market may vary significantly from their Intraday Indicative Value.**
>
> **Investors can compare the trading price of the ETNs (if such concurrent price is available) against the Intraday Indicative Value to determine whether the ETNs are trading in the secondary market at a premium or a discount to the economic value of the ETNs at any given time.** Investors are cautioned that paying a premium purchase price over the Intraday Indicative Value at any time could lead to the loss of any premium in the event the investor sells the ETNs when the premium is no longer present in the marketplace or when the ETNs are accelerated (including at our option, which we have the discretion to do at any time).
>
> (**emphasis in original**).

26.    During the Class Period, the relevant VIX futures for purposes of calculating the

Intraday Indicative Value were the February 2018 and March 2018 contracts.

7

27.     As set forth in the January Supplement, Defendants represented to XIV investors that the Intraday Indicative Value would be calculated every 15 seconds.

28.     Further, Defendants specifically represented that an Intraday Indicative Value would be published and disseminated throughout the trading day, and that once daily, Defendants would issue a Closing Indicative Value.

29.     Defendants further represented to Plaintiff and other Class members that the Intraday Indicative Value was to be derived from "[t]he most recent intraday level of such Index at the particular time."  Thus, investors were informed that the Intraday Indicative Value, which was to be calculated every 15 seconds, was to be tied to the SPX Index:

> The return on the ETNs is linked to the daily performance of one of the Indices. Each of the Indices models returns from a long position in VIX futures contracts that is rolled continuously throughout the period between futures expiration dates.
>
> The level of each Index is calculated in accordance with the method described below. The value of each Index will be published by Bloomberg in real time and after the close of trading on each Index Business Day under the following ticker symbols:

| Index Name | End of Day Ticker | Intraday Ticker |
|---|---|---|
| S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP | SPVXSPID |
| S&P 500 VIX Medium-Term Futures™ Index ER | SPVXMP | SPVXMPID |

> **The intraday level of each of the Indices is calculated in real time by S&P on each S&P 500 VIX Futures Business Day using the same methodology as for calculation of the closing level but applying real time prices of the relevant VIX futures contracts**.
>
> (**emphasis added**).

30.     As set forth in the registration statement, and most recently iterated in the January Supplement, a Market Disruption Event is defined as follows:

> A "**Market Disruption Event**" will be any event that, in the determination of the Calculation Agents, could materially interfere with our, our affiliates, third parties with whom we transact, or similarly situated third party's ability to establish, maintain or unwind all or a material portion of a hedge that could be effected with respect to the ETNs, including, but not limited to:

- a suspension, absence or material limitation of trading in option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,

- option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, if available, not trading on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,

- the Index Sponsor or the CBOE fails to publish or compute the Indices or VIX Index, or

- any trading restriction imposed upon, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange due to a price change in that respective instrument exceeding limits set by that market before the close of trading in that market on any day, as determined by the Calculation Agents.

**(emphasis in original)**.

31.     Further, the registration statement and January Supplement each disclose

scenarios under which Credit Suisse will either have the optionality or obligation to subject the

XIV Notes to "acceleration," as follows:

> We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date (an "**Optional Acceleration**"). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration**"). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date. In the case of an Optional Acceleration, the "**Accelerated Valuation Date**" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration. In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day). The Accelerated Redemption Amount will be payable on the third Business Day following the

Accelerated Valuation Date (such third Business Day the "**Acceleration Date**"). The Acceleration Date will be postponed if a Market Disruption Event occurs and is continuing on the Accelerated Valuation Date. No interest or additional payment will accrue or be payable as a result of any postponement of the Acceleration Date. See "Specific Terms of the ETNs—Market Disruption Events." We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes.

As discussed in more detail under "Specific Terms of the ETNs—Acceleration at Our Option or Upon an Acceleration Event" in this pricing supplement**, an Acceleration Event includes any event that adversely affects our ability to hedge or our rights in connection with the ETNs, including, but not limited to, if the Intraday Indicative Value is equal to or less than 20% of the prior day's Closing Indicative Value**.

(**emphasis added**).

32.    As of close of trading on February 5, 2018, Credit Suisse had not announced any Market Disruption Event, or otherwise notified XIV investors of acceleration.

33.    As more fully described below, Defendants' representations of their pricing mechanism -- designed to update every 15 seconds, based on the SPX via real-time pricing in VIX futures contracts -- were materially false and misleading.

*The February 5, 2018 Collapse of XIV*

34.    On Friday, February 2, 2018, XIV closed its regular trading session at 4:00 p.m. EST with a price of $108.3681 per Note.

35.    In the next trading session, on February 5, 2018, XIV Notes closed their regular market session at $99 per Note.

36.    In the ensuing after-hours trading session on February 5th, Defendants failed to follow the foregoing pricing mechanism underlying the Indicative Value of XIV.

37.    From 4:10 p.m. - 5:09 p.m. EST, Defendants materially misrepresented the value of the XIV Notes.  During this time frame, investors were purchasing XIV Notes at prices as

high as the $80's, while Defendants were representing to the public that XIV's Intraday

Indicative Value was $24.6961.

38.     By 4:15p.m. EST on February 5, 2018, Defendants knew or recklessly

disregarded that XIV was in severe distress and thus facing an impending liquidation, based

upon extreme volatility in VIX futures pricing.  Pursuant to Credit Suisse's registration statement

and its most recent January Supplement, Defendants represented that XIV's Closing Indicative

Value would be determined based upon applying the negative percentage change in the closing

VIX futures' settlement values from the previous days VIX futures' settlement values.

39.     On February 5, 2018, by 4:15 p.m. EST the last trade in the February futures

contract was at $33.20, and the last trade in the March contract was $27.95.  The pricing on these

contracts was 112.5% and 86.8% higher, respectively, than the prior close for the corresponding

February and March futures contracts.

40.     As set forth in Credit Suisse's registration statement and January Supplement,

such drastic movements in futures pricing will essentially ensure that an Acceleration Event will

be triggered:

> If the price of the underlying futures contracts increases by more than 80% in a day, it is
> extremely likely that the Inverse ETNs will depreciate to an Intraday Indicative Value or
> Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative
> Value and will be subject to acceleration if we choose to exercise our right to effect an
> Event Acceleration of the ETNs.

41.     By 4:15 p.m. EST on February 5th, Defendants knew or recklessly disregarded

that the Closing Indicative Value from February 2nd to February 5th would represent a decline in

excess of 80%, making an Acceleration Event and liquidation a certainty.

42.     The February 5th futures pricing (see supra, ¶ 39) supported an Intraday Indicative

Value on XIV of $4.40 per Note and a Closing Indicative Value of $4.22.  Nevertheless,

Defendants incorrectly reported XIV's Indicative Value as $24.6961 until 5:08 p.m. in after-hours trading.  While Credit Suisse and its agent, JIC, were reporting a value, that value was not based on indices "calculated in real time by S&P … applying real time prices of the relevant VIX futures contracts."

43.    As a direct result of Defendants' material misrepresentations as to the true Indicative Value of XIV and failure to publish an accurate Intraday Indicative Value, the XIV Notes traded at significantly inflated prices.

44.    Predictably, on February 6, 2018, Credit Suisse issued a press release indicating that XIV had experienced an Acceleration Event, and accordingly, was to be liquidated:

> Since the intraday indicative value of XIV on February 5, 2018 was equal to or less than 20% of the prior day's closing indicative value, an acceleration event has occurred. Credit Suisse expects to deliver an irrevocable call notice with respect to the event acceleration of XIV to The Depository Trust Company by no later than February 15, 2018. The date of the delivery of the irrevocable call notice, which is expected to be February 15, 2018, will constitute the accelerated valuation date, subject to postponement due to certain events. The acceleration date for XIV is expected to be February 21, 2018, which is three business days after the accelerated valuation date. On the acceleration date, investors will receive a cash payment per ETN in an amount equal to the closing indicative value of XIV on the accelerated valuation date. The last day of trading for XIV is expected to be February 20, 2018. As of the date hereof, Credit Suisse will no longer issue new units of XIV ETNs.

> On February 2, 2018, the closing indicative value was USD 108.3681. None of the other ETNs offered by Credit Suisse are affected by this announcement.

45.    By 6:28 p.m. EST in after-hours trading on February 5th, XIV Notes had collapsed in value to $10.16 per Note, representing a near 90% decline in price from the closing price on February 2nd.

46.    The final trading session for XIV occurred on February 20, 2018.  The following day, the XIV Notes were subject to liquidation.

**STATUTORY SAFE HARBOR**

47.     The statutory safe harbor provided for forward-looking statements does not apply herein as the statements challenged above were not forward-looking.

**ADDITIONAL ALLEGATIONS OF SCIENTER**

48.     As more particularly alleged herein, Defendants acted with scienter in that they: a) deliberately and intentionally engaged in acts and practices and a course of conduct which had the effect of artificially inflating and maintaining at artificial levels the price of the XIV Notes in the market; b) knew or recklessly disregarded facts or had access to information indicating that their public statements were not accurate; and/or c) deliberately engaged in behavior in violation of the Exchange Act.

49.     Further, Defendants knew that their statements would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

50.     In addition, Defendants had access to information from which they were actually aware that the Intraday Indicative Values that they disseminated to the public on February 5, 2018 were inaccurate, and knew that the XIV Notes' market prices were directly correlated with and caused by Defendants' reported Intraday Indicative Values.  Therefore, Defendants had actual knowledge that their acts and omissions with respect to disseminating accurate Intraday Indicative Values caused Plaintiff and the Class to purchase XIV Notes at artificial prices, and intentionally caused this result via their acts and omissions.

## EFFICIENT MARKET ALLEGATIONS

51.     Plaintiff will rely, in part, on the efficient market hypothesis and the "fraud on the market" doctrine.  At all relevant times, the market for the XIV Notes was an efficient market for the following reasons.

52.     The XIV Notes met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market.

53.     During the Class Period the XIV Notes were actively traded and at least thousands of XIV Notes exchanged hands each trading day.

54.     As a result of the foregoing, the market for the XIV Notes promptly digested current information regarding the XIV Notes from all publicly-available sources and reflected such information in the XIV Notes' price.  Under these circumstances, Plaintiff and the Class were injured by, *inter alia,* artificially inflated prices at the times that they purchased XIV Notes, and a presumption of reliance applies.

## CLASS ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").  The Class in this action ("Class") consists of all persons who purchased or otherwise acquired Credit Suisse's VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes (defined above as "XIV Notes") from January 29, 2018 through February 5, 2018 (the "Class Period").

56.     At least thousands of persons are believed to be members of the putative class ("Class"), and those persons or entities are geographically dispersed.  Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

57.     Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).  Common issues of law and fact include but are not limited to:

(i)      whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

(ii)     whether the Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(iii)    whether the price of XIV Notes during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(iv)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     Plaintiff's interests are typical of, and not antagonistic to the interests of, the Class.

59.     Plaintiff has retained competent counsel experienced with class actions and complex litigation and intends to vigorously prosecute this action.

60.     Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Indeed, a class action is the only method by which Plaintiff and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.

61.      The size of individual damages is small in comparison to the complexity and scope of the Defendants' alleged unlawful conduct.  Plaintiff does not anticipate any difficulties in the management of this action as a class action.

15

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (Under Section 10(b), Exchange Act
### and SEC Rule 10b-5)

62.     Plaintiff incorporates by reference the allegations set forth above as though fully set forth herein.

63.      Defendants, and each of them, made untrue statements of material fact, and omitted to disclose material facts, that were intended to and did: (i) deceive the investing public, including Plaintiff; and (ii) artificially inflate and maintain the market price of the XIV Notes. Plaintiff and the Class purchased XIV Notes based on Defendants' false and misleading statements and the artificially inflated prices of the XIV Notes.

64.     Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, all in violation of Section 10(b) of the Exchange Act and Rule 10b-5, as further alleged above.

65.     Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the XIV Notes' true value.  Defendants knew or recklessly disregarded that their statements concerning the XIV Notes' true value were false and misleading, as further alleged above.

66.     Further, Defendants' actions and inactions with respect to disseminating inaccurate Intraday Indicative Values, failure to provide accurate and updated Intraday Indicative Values, and otherwise, constitute an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

67.     Defendants were required to comply with all relevant SEC, NASD and FINRA regulations at relevant times.  In addition, said Defendants had a duty to fully disclose the truth concerning the XIV Notes as a result of the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X [17 C.F.R. § 210.1, et seq.], S-K [17 C.F.R. § 229.10, et seq.], and other SEC regulations.

68.     In ignorance of the fact that the market price of the XIV Notes was inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiff and the Class purchased XIV Notes and were damaged thereby when the XIV Notes' value collapsed after Defendants' scheme unraveled.

69.     As a direct result of the unraveling of Defendants' scheme, the price of the XIV Notes collapsed on February 5, 2018 and thereafter, leading to enormous economic losses by Plaintiff and the Class.

70.     At the time of Defendants' misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true.  Had Plaintiff known of the truth of the misrepresentations or known of the omitted material facts, Plaintiff would not have purchased the XIV Notes.

71.     Plaintiff and similarly situated investors were injured because the risks that materialized were risks of which Plaintiff was unaware (but of which Defendants were aware), and Plaintiff's losses were caused by drops in market prices of XIV Notes (and the resultant liquidation) due to materialization of risks concealed by Defendants.

72.     By virtue of the foregoing, Defendants each violated section 10(b) of the
Exchange Act and Rule 10b-5(b) and (c) promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff
suffered damages in an amount to be proven at trial.

## JURY DEMAND

74.     Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, certifying Plaintiff as class
representative under Federal Rule of Civil Procedure 23 and appointing Plaintiff's counsel as
class counsel;

B.      Awarding damages against Defendants, jointly and severally, including
disgorgement of all unjust enrichment, for damages suffered as a result of Defendants' violation
of the securities laws;

C.      Awarding Plaintiff the costs and expenses of this litigation, including reasonable

attorneys' fees, and experts' fees and other costs and disbursements; and

D.      Granting Plaintiff such other and further relief as the Court may deem just and

proper.

Dated: New York, New York
       May 4, 2018

Respectfully submitted,

LAW OFFICE OF
CHRISTOPHER J. GRAY, P.C.

By: Christopher J. Gray
    Michael J. Giarrusso
360 Lexington Avenue, 14th Floor
New York, New York 10017
(212) 838-3221
(212) 937-3139 (fax)

ECCLESTON LAW, LLC
James J. Eccleston
Stephany D. McLaughlin
55 W. Monroe, Suite 610
Chicago, IL 60603
(312) 332-0000
(312) 332-0003 (fax)

*Counsel for Plaintiff*