USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/25/2019

UNITED STATES DISTRICT COURT

SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated,

                Plaintiff,

-against-

CREDIT SUISEE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, and JANUS DISTRIBUTORS LLC d/b/a JANUS HENDERSON DISTRIBUTORS,

                Defendants.

GLENN EISENBERG, on Behalf of Himself and All Others Similarly Situated,

                Plaintiff,

-against-

CREDIT SUISSE AG and JANUS INDEX & CALCULATION SERVICES LLC,

              Defendants.

SHAOLEI QIU, on Behalf of Himself and All Others Similarly Situated,

                Plaintiff,

-against-

CREDIT SUISSE GROUP AG and JANUS INDEX & CALCULATION SERVICES LLC,

              Defendants.

18 Civ. 2268 (AT) (SN)
18 Civ. 2319 (AT) (SN)
18 Civ. 4045 (AT) (SN)

**ORDER**

ANALISA TORRES, District Judge:

Before the Court are Plaintiffs' objections to the Report and Recommendation ("R&R") of Magistrate Judge Sarah Netburn concerning Defendants' motions to dismiss Plaintiffs' complaint alleging violations of the federal securities laws. *See generally* Pl. Obj., ECF No. 128;

*see also* R&R, ECF No. 124.[1]  For the reasons stated below, the R&R is ADOPTED in full.

## BACKGROUND[2]

I.  Factual Background

This case arises out of the collapse of a complex investment vehicle known as VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes ("XIV notes" or "XIV ETNs").  R&R at 2.  XIV notes provided a mechanism by which investors could profit from low volatility in the stock market.  *See* R&R at 5.  In purchasing an exchange traded note ("ETN"), investors agree to pay money to the institution sponsoring the ETN in return for a payment when the note matures, the amount of which is determined by the value of a market index.  *See id.* at 4.  In this case, the value of XIV notes was derived from the VIX Futures Index, an index that aggregates the price of "VIX futures," which in turn track a measure of market volatility.  *See id.*  To allow investors to bet against market volatility, the value of XIV notes was inverse to the value of the VIX Futures Index, such that "when the VIX futures contracts underlying the VIX Futures Index decreased in value by 1%, the XIV notes' value increased by 1%, and vice versa."  *Id.* at 4–5.  Credit Suisse AG issued and sold the notes, and Janus Henderson Distributors LLC placed and marketed them.  *See id.* at 4.

Credit Suisse AG and Janus Henderson Distributors issued a prospectus for the XIV notes, and a supplement to the prospectus on January 29, 2018 ("January Supplement" or "Supplement") in connection with the issuance of more than 16 million additional notes.  *See*

---

[1] All ECF citations are to the docket in Case No. 18 Civ. 2268.

[2]  The Court presumes familiarity with the facts and procedural history as set forth in the R&R, *see* R&R at 2–16, but will reiterate some key factual allegations here.  Because the parties have not objected to the R&R's characterization of the background facts as alleged in Plaintiffs' consolidated class action complaint, Compl., ECF No. 82, the Court adopts the R&R's "Background" section and takes the facts characterized therein as true.  *See Roberts ex rel. Phillip v. Happiness Is Camping, Inc.*, No. 10 Civ. 4548, 2012 WL 844331, at *1 (S.D.N.Y. Mar. 13, 2012).

ECF No. 103-1; R&R at 4.  (Judge Netburn deemed the January Supplement integral to the complaint and considered its contents in assessing the motion to dismiss; no party has objected to that determination.  *See* R&R at 4 n.1)  The Supplement set out the conditions under which Credit Suisse AG would be required to pay noteholders, and provided that the company would pay them based on the notes' "closing indicative value"—an amount calculated at the end of each trading day based on that day's movement in the VIX Futures Index.  *Id.* at 5.  Because the closing indicative value was only calculated once per day, an "intraday indicative value" was also automatically calculated every 15 seconds and distributed on NASDAQ, by applying the same formula used to calculate the closing indicative value to the most recent value of the VIX Futures Index published by that index's sponsor, Standard & Poors (S&P).  *See id.*  Neither the closing indicative value nor the intraday indicative value necessarily reflected the actual market price of the notes.  *See id.*  If the notes matured, Credit Suisse AG was required to pay the closing indicative value on the maturity date.  *Id.* at 5–6.  Credit Suisse AG could also "accelerate" the notes in two circumstances:  (1) at its option, in which case it would be required to pay the closing indicative value at a date at least 5 days after the optional acceleration; or (2) if a predefined "Acceleration Event" occurred—including if the intraday indicative value dropped 80% or more from the prior day's closing indicative value—in which case it would pay the closing indicative value on the day the Event occurred.  *See id.* at 6.

The January Supplement designated Credit Suisse International and Janus Index and Calculation Services LLC—two entities affiliated with, but separate from, Credit Suisse AG and Janus Henderson Distributors—as responsible for calculating the value of the notes, and allocated responsibilities between them.  *See id.*  Janus Index and Calculation Services had "the sole ability to calculate and disseminate the Closing Indicative Value," while Credit Suisse

International had "the sole ability to make determinations with respect to reduction of the Minimum Redemption Amount, certain Acceleration Events, and calculation of default amounts." *Id.* (internal quotation marks omitted).

The January Supplement also included several warnings about the risks associated with trading XIV notes. *See id.* at 9. It warned that "[t]he long term expected value of [the] ETNs is zero. If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment." *Id.* at 10 (internal quotation marks and emphasis omitted). It also warned that the intraday indicative value could be inaccurate at times because "[p]ublished underlying Index levels from the Index Sponsor [S&P] may occasionally be subject to delay or postponement," and "[a]ny such delays or postponements will affect the current underlying Index level and therefore the Intraday Indicative Value of your ETNs." *Id.* at 11 (second brackets in original, internal quotation marks omitted). It disclosed that Credit Suisse intended to hedge its exposure to the notes, and that "[t]he costs of maintaining or adjusting this hedging activity could affect the value of the Index, and accordingly the value of the ETNs." *Id.* at 12 (internal quotation marks omitted). Because "this hedging activity may result in our or our affiliates' receipt of a profit, even if the market value of the ETNs declines," it warned that "[t]here may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents." *Id.* (internal quotation marks omitted). And the Supplement specifically warned that investors faced a risk of losing their investment in the event of an acceleration: "[B]ecause of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the amount of your initial investment in the XIV ETNs, and you are likely to lose all or part of your initial investment." *Id.* at 13 (brackets, bolding, and internal quotation marks omitted).

Credit Suisse AG issued XIV notes on three occasions: in 2010, when it issued 9,018,880 notes; in June 2017, when it issued another 5 million; and on January 29, 2018, when it issued another 16,275,000 (accompanied by the January Supplement). *See id.* at 7. The value of the notes increased dramatically over this time period. *See id.* Because Credit Suisse AG's potential liability increased proportionately, it sought to hedge against its obligations by taking a short position on VIX futures; thus, a fall in the VIX Futures Index would increase Credit Suisse's obligation to noteholders, but would also allow Credit Suisse to make profits from its short position. *See id.* at 7–8.

The events that ultimately led to this litigation occurred on February 5, 2018, when the S&P 500 dropped 4.1%. *See id.* at 13–14. This sudden spike in market volatility was reflected in the VIX Futures Index, and over the course of regular trading on February 5, the intraday indicative value of XIV dropped from $108.37 to $72.59. *See id.* In response to this drop in value (and corresponding reduction in its exposure to XIV notes), Credit Suisse AG sought to reduce its short position by purchasing over 105,000 VIX futures contracts between 4:00 PM and 4:15 PM. *See id.* at 14. These purchases amounted to roughly one-fourth of the entire VIX futures market. *See id.* That increase in trading caused the VIX Futures Index to skyrocket, and thus the value of XIV notes to plummet, ultimately landing 96% below where they had closed on the previous trading day. *See id.* But from 4:09 p.m. to 5:09 p.m. the intraday indicative value of XIV notes distributed on NASDAQ did not update to reflect this change. *See id.* at 14–15. During that "Flatline Period," investors bought $700 million worth of XIV notes at a price that far exceeded their real value. *Id.* at 15. The next morning, Credit Suisse International declared an Acceleration Event based on the drop in value, specifying February 15 (five trading days later) as the date for calculating the closing indicative value that would be paid out to

noteholders. *See id.* Credit Suisse AG ultimately redeemed the notes at $5.99 per note. *See id.* Plaintiffs estimate that Credit Suisse made between $475 million and $542 million in profit by redeeming the notes at that price. *See id.*

II. Procedural Background

Several plaintiffs filed suit against Credit Suisse AG (the issuer), Credit Suisse International (one of the calculation agents), Credit Suisse Group AG (their holding company), Tidjane Thiam (Credit Suisse Group's CEO), David R. Mathers (Credit Suisse Group's CFO) (collectively, "Credit Suisse Defendants"); and Janus Henderson Distributors, LLC (the marketer), Janus Index & Calculation Services LLC (the other calculation agent), and Janus Henderson Group plc (their holding company) (collectively "Janus Defendants"). *See* R&R at 3, 15. Under Federal Rule of Civil Procedure 42(a) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), the suits were consolidated, and Plaintiffs filed a consolidated class action complaint (Complaint). Compl., ECF No. 82; *see* R&R at 16. Plaintiffs assert three primary categories of claims. First, they claim that the offering documents for the XIV notes made material misstatements or omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, concerning (1) the existence of a conflict of interest between Credit Suisse and investors, *see* Compl. ¶¶ 219–220; (2) the reliability and accuracy of the intraday indicative value, *see* Compl. ¶¶ 221–222; and (3) the effect of Credit Suisse's hedging on the value of XIV notes, *see* Compl. ¶¶ 223–228. *See* R&R at 23.[3] Second, they claim that the Credit Suisse entities and individuals engaged in a scheme to

---

[3] The R&R also discusses a fourth category of alleged misstatements concerning the suitability of XIV notes for long-term investing, *see* R&R at 23, but Plaintiffs expressly disavow any claim related to that category of statements in their objections to this Court. *See* Pl. Obj. at 17.

6

manipulate the market in violation of Section 10(b), by issuing more than 16 million additional XIV notes in January of 2018 as part of a plan to trigger a liquidity crunch, which would cause the notes' value to crater and allow Credit Suisse to accelerate the notes at a large profit. *See* Compl. ¶¶ 111–116, 275–278; R&R at 27. Third, they claim that the Credit Suisse entities and the Janus entities effectively made a material misstatement or omission in violation of Section 10(b) by failing to take action to correct the intraday indicative value or warn the market during the Flatline Period. *See* Compl. ¶ 189; R&R at 28–29. In addition, they assert claims under Section 9(a)(4) of the Exchange Act, based on the same alleged false statements supporting the Section 10(b) claims, *see* Compl. ¶¶ 285–289; R&R at 41, and assert claims for secondary liability under Section 20(a) of the Exchange Act against Thiam, Mathers, Credit Suisse Group, and Janus Henderson Group as controlling persons of the other entities, *see* Compl. ¶¶ 279–284.

Defendants moved to dismiss the complaint, *see* ECF Nos. 101, 105, and on December 17, 2018, the Court referred the matter to the Honorable Sarah Netburn. ECF No. 113. On August 16, 2019, Judge Netburn issued an R&R recommending that Defendants' motions to dismiss be granted in their entirety. R&R at 41. She found that the January Supplement had expressly warned of all the risks involved in purchasing XIV notes that Plaintiffs claim ultimately caused their losses, *see id.* at 23–24, and that Plaintiffs' allegations could not support a strong inference of scienter, as required by the PSLRA, for either their market-manipulation or failure-to-correct claim, *see* R&R at 31–32.

Plaintiffs timely filed their objections to the R&R on August 30, 2019. Pl. Obj., ECF No. 128. Defendants timely filed their responses on September 13, 2019. Janus Def. Resp., ECF No. 131; Credit Suisse Def. Resp., ECF No. 132. The objections to the R&R are now fully briefed,

and for the reasons stated below the Court ADOPTS the R&R in its entirety.[4]

## DISCUSSION

I. <u>Standard of Review</u>

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When a party makes specific objections, the court reviews *de novo* those portions of the report and recommendation that have been properly objected to. *Id.*; Fed. R. Civ. P. 72(b)(3). However, "when a party makes only conclusory or general objections, or simply reiterates his original arguments," the court reviews the report and recommendation strictly for clear error. *Wallace v. Superintendent of Clinton Corr. Facility*, No. 13 Civ. 3989, 2014 WL 2854631, at *1 (S.D.N.Y. June 20, 2014); *see also Bailey v. U.S. Citizenship & Immigration Serv.*, No. 13 Civ. 1064, 2014 WL 2855041, at *1 (S.D.N.Y. June 20, 2014) ("[O]bjections that are not clearly aimed at particular findings in the [report and recommendation] do not trigger *de novo* review."). In addition, "new arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." *Razzoli v. Fed. Bureau of Prisons*, No. 12 Civ. 3774, 2014 WL 2440771, at *5 (S.D.N.Y. May 30, 2014). The court may adopt those portions of the report and recommendation to which no objection is made "as long as no clear error is apparent from the face of the record." *Oquendo v. Colvin*, No. 12 Civ. 4527,

---

[4] On September 18, 2019, Plaintiffs filed a reply memorandum of law to Defendants' responses. ECF No. 133. "This Court declines to consider plaintiffs' reply memorandum given that Fed.R.Civ.P. 72(b)(2) authorizes only objections and a response, not a reply, to a magistrate judge's report and because plaintiffs never sought leave of the Court to file these papers." *Mordukhaev v. Daus*, No. 09 civ 5149, 2010 WL 3792191, at *1 n.1 (S.D.N.Y. Sept. 28, 2010), *aff'd*, 457 F. App'x 16 (2d Cir. 2012). In any event, the arguments and authorities in the reply memorandum would not alter the Court's conclusions.

2014 WL 4160222, at *2 (S.D.N.Y. Aug. 19, 2014) (internal quotation marks and citation omitted).

    II.    <u>Plaintiffs' Objections</u>

        A. Alleged Misstatements in the Offering Documents

Plaintiffs raise several objections to Judge Netburn's conclusion that they did not allege any misstatements or omissions in violation of Section 10(b) and Section 11 in the XIV notes' offering documents. *See* Pl. Obj. at 17–19. Plaintiffs' claim the Defendants violated subsection (b) of SEC Rule 10b-5, which prohibits "mak[ing] any untrue statement of a material fact or . . . omit[ing] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 156–57 (2008) (citation and internal quotation marks omitted); *see also id.* ("Rule 10b-5 encompasses only conduct already prohibited by § 10(b)."). "To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) (citation omitted). Judge Netburn determined that Plaintiffs had not alleged any misstatements or omissions of material fact, because the offering documents expressly warned of the risk that Credit Suisse's hedging could affect the value of XIV notes, that the value of the notes could drop to zero in the event of an acceleration, and that the intraday indicative value could be inaccurate based on delays in calculation. R&R at 24–26. There cannot be a material misstatement or omission if "[defendants'] . . . statement[s] explicitly disclosed the very liquidity

risks about which appellants claim to have been misled." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 135 (2d Cir. 2011) (internal quotation marks omitted).  There also cannot be a violation of Section 11 in that circumstance, because the test for a material misstatement or omission is the same under the two provisions.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

Plaintiffs object that Judge Netburn overlooked a key misstatement in the January Supplement.  They assert that the Supplement stated that the Credit Suisse entities "have no reason to believe that [their] . . . hedging activities will have a material impact on the level of the [VIX Futures] Index." Pl. Obj. at 17–18 (internal quotation marks omitted) (brackets and ellipses in original), when in fact Credit Suisse had strong reason to believe that its hedging would affect the value of the index based on the course of events during three prior volatility spikes.  *See* Pl. Obj. at 19.  Though Judge Netburn did not address that statement directly, she addressed and rejected the argument that Credit Suisse withheld any material information on previous volatility spikes or the effect of Credit Suisse's hedging, so Plaintiffs' objection is reviewed only for clear error.  Judge Netburn held that the previous spikes in volatility and their effect on the VIX Futures Index were public information readily available to investors.  R&R at 25; *cf. Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 38 (2d Cir. 2017) ("The materiality of an omission must be assessed in light of the total mix of information in the public domain.").  And she held that Defendants were not required to project future volatility spikes and predict their effect on XIV notes' value, because "[i]t is not a material omission to fail to predict future market performance." *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014) (citation and internal quotation marks omitted) (dismissing misrepresentation claims related to a similar VIX-linked ETN on that basis), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F.

App'x 37 (2d Cir. 2014); *see* R&R at 25.  Moreover, in context, the statement in the offering documents was much more equivocal than Plaintiffs represent.  Describing the possibility that Credit Suisse's hedging might affect the VIX Futures Index, the January Supplement stated, "*Although* we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index, *there can be no assurance that the level of the applicable underlying Index will not be affected*."  Jan. Supp., ECF No. 103-1, at 60[5] (emphasis added).  Plaintiffs have not shown any clear error.

Plaintiffs also object that the R&R is internally inconsistent.  They argue that in the context of their offering-documents claims Judge Netburn held that they failed to establish the existence of a misleading statement or omission related to Credit Suisse's hedging, but in the context of their market-manipulation claim she held that they adequately alleged that Credit Suisse misled investors by failing to disclose its supposed scheme to create a liquidity crunch.  *See* Pl. Obj. at 18.  This specific objection is reviewed *de novo*.  But it is meritless.  Judge Netburn did not hold in resolving the market-manipulation claim that Plaintiffs had plausibly alleged that Credit Suisse misrepresented or concealed the effect on the VIX Futures Index of previous liquidity spikes or its own hedging during those spikes; to the contrary, she found that information to be publicly available.  The misrepresentation that Judge Netburn found to be plausible was Credit Suisse's purported concealment of its plan to use those effects to manipulate the markets.  *See* R&R at 28.  There is, therefore, no inconsistency.

Accordingly, Plaintiffs' objections with respect to their offering-documents claims are OVERRULED.

---

[5] Because ECF No. 130-1 contains several separately paginated documents, this page number citation is to the page in the ECF filing.

B. Alleged Market Manipulation

Plaintiffs raise several objections to the R&R's conclusion that their allegations that Credit Suisse executed a scheme to manipulate the market for XIV notes fail to produce a strong inference of scienter. *See* Pl. Obj. at 6. Plaintiffs' claim is based on the allegation that Credit Suisse sold a large volume of XIV notes in January 2018 because it knew that doing so would increase its need to hedge in the VIX futures market, and eventually the volume of its hedging transactions would cause the VIX Futures Index to spike and the value of XIV notes to crater when market volatility returned. *See* Compl. ¶ 111. This is a claim under Rule 10b-5(a) and (c), "which make[] it unlawful . . . [t]o employ any device, scheme, or artifice to defraud" and "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. . . in connection with the purchase or sale of any security." *Stoneridge*, 552 U.S. at 156–57 (citation and internal quotation marks omitted). A claim for market manipulation "requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101. Plaintiffs can establish scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Under the PSLRA, Plaintiffs are required to meet the heightened burden of pleading facts that give rise to a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A), which means they "must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007). Judge Netburn concluded that Plaintiffs had not carried

this burden, because there was a more plausible innocent explanation of Credit Suisse's motives: it had simply taken advantage of the high price of XIV notes in January 2018 by selling them in large quantities, and then taken advantage of the market crash in February 2018 by exercising its right to accelerate the notes and force redemption at a very low price, without intending the former action to cause the latter. *See* R&R at 34.

Plaintiffs object that they alleged two motives for Credit Suisse and its executives to engage in a calculated scheme—pressure to scale back its derivatives business and desire to make a profit—and that Judge Netburn did not address the profit motive. Pl. Obj. at 7. But Judge Netburn expressly held that the "inference of an ordinary profit motive is . . . non-culpable." R&R at 34. Because this argument was presented to and ruled on by Judge Netburn, it is reviewed only for clear error, and there was none. *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this [scienter] inquiry.").

Plaintiffs further object that Judge Netburn failed to consider their allegation that Credit Suisse must have known that a spike in volatility was imminent. They allege that such spikes are statistically certain to occur on a regular basis, and that Credit Suisse was aware that an increase in volatility would cause liquidity problems in the VIX futures market as a result of adjustments to their hedge, because such issues had emerged during three prior spikes and Credit Suisse had taken action in response. *See* Pl. Obj. at 8, 11–12. But Judge Netburn addressed these precise arguments, and rejected them. *See* R&R at 33. This Court, therefore, reviews for clear error, and finds none. To "raise[] an inference of scienter based on knowledge of or access to

information demonstrating the inaccuracy of [a defendant's] public statements"—or, for a market-manipulation claim like this one, the inaccuracy of the impression produced by a defendant's actions—plaintiffs "must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). Plaintiffs have not identified any specific documents that would have put Credit Suisse on notice of the statistical certainty of volatility spikes or the effect of Credit Suisse adjusting its hedge during such spikes.

Plaintiffs also object that Judge Netburn overlooked alleged false statements by Credit Suisse and Thiam, which show that they were trying to cover up a fraudulent scheme. Pl. Obj. at 9–10. These specific objections are reviewed *de novo*. Plaintiffs point again to Credit Suisse's statement that it had "no reason to believe" its hedging would "have a material impact on the level of the applicable underlying Index," but as discussed above, that statement reflected nothing more than Credit Suisse's permissible refusal to predict the future performance of the market. *See TVIX Sec. Litig.*, 25 F. Supp. 3d at 452. Plaintiffs also point to Thiam's statement that the decision to accelerate the notes "was actually to protect investors. Because the product stopped trading, it was quasi-impossible to price." Pl. Obj. at 9–10. But the more plausible inference from that statement is that Thiam was simply seeking to put a positive face on an aggressive (but legitimate) business decision.

Finally, Plaintiffs object that Judge Netburn failed to consider the magnitude of Credit Suisse's maneuvers, and the ultimately devastating effect they had on the market for XIV notes, as circumstantial evidence of scienter. Pl. Obj. at 10. More specifically, they point to the allegation that Credit Suisse issued so many notes in January 2018 that it breached its risk limits, requiring the action to be approved by a high-level risk-management committee. *See* Pl. Obj. at

14

8–9. Judge Netburn rejected this argument, so it is reviewed only for clear error. And Judge Netburn did not clearly err in concluding that, notwithstanding the size of the January sale, the innocent explanation for the large volume of XIV notes sales in January 2018 was more plausible than the inference that Credit Suisse engaged in those sales in order to later cause a liquidity crash. R&R at 34; *see ATSI*, 493 F.3d at 100 ("[S]howing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security" is required for scienter).

Accordingly, Plaintiffs' objections with respect to their market-manipulation claims are OVERRULED.

### C. Alleged Failure to Correct Misinformation

Plaintiffs raise several objections to the R&R's conclusion that they failed to establish a strong inference of scienter on their claim that the Credit Suisse and Janus entities made a material misrepresentation or omission by failing to correct the intraday indicative value during the Flatline Period on February 5, 2018. Pl. Obj. at 3–4. Plaintiffs' claim is that Defendants' inaction amounted to a violation of Rule 10b-5(b), because "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014), which extends to the duty to correct information the company is responsible for when it knows that information has become misleading or false. *See* Pl. Obj. at 1–2; *cf. Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 486 (2d Cir. 2007) (recognizing a duty to correct statements that a party learns are false or misleading in some circumstances). But Judge Netburn found that Plaintiffs failed to allege specific facts showing that the entities with control over the intraday indicative value—Janus Index & Calculation Services and Credit Suisse

International—were aware of the problems with the value, or had a motive to refrain from correcting it.  *See* R&R at 35–37, 38–39.

Plaintiffs object that Judge Netburn did not consider their allegation that Janus Index & Calculation Services and Credit Suisse International must have monitored the VIX Futures Index, which was used to calculate the intraday indicative value, because those entities were responsible for declaring a market disruption event when the Index failed to be "publish[ed] or compute[d]."  Pl. Obj. at 4 (internal quotation marks omitted).  But Judge Netburn plainly did consider those allegations.  *See* R&R at 36–37, 39.  This objection, therefore, is reviewed for clear error.  And Plaintiffs do not "specifically identify the reports or statements containing" information that would have put Janus or Credit Suisse on notice that the Index was not updating.  *Teamsters*, 531 F.3d at 196 (internal quotation marks omitted).  Though they argue that Janus and Credit Suisse's failure to monitor the Index and the underlying value of VIX futures would also be circumstantial evidence of scienter, Pl. Obj at 5, they have not shown that Judge Netburn committed clear error in rejecting that argument on the grounds that "[a]n allegation that a defendant merely ought to have known is not sufficient to allege recklessness."  R&R at 37 (citation omitted).

Finally, Plaintiffs object that Credit Suisse AG must have been aware of the issue with the VIX Futures Index, because Credit Suisse AG was trading VIX futures at that time.  *See* Pl. Obj. at 5 n.4.  But Judge Netburn rejected that argument on the grounds that Credit Suisse AG was not responsible for the intraday indicative value; Credit Suisse International was, and Plaintiffs have not alleged that anyone at Credit Suisse International was monitoring the price movements of VIX futures.  R&R at 39.  That holding was not clear error.

Accordingly, Plaintiffs' objections with respect to their failure-to-correct claims are OVERRULED.

### D. Other Claims

Judge Netburn's sole basis for recommending dismissal of Plaintiffs' claims under Section 9 of the Exchange Act was that those claims parallel Section 10(b) claims, R&R at 41, and the sole objection Plaintiffs raise to that recommendation is that their Section 10(b) claims are meritorious, Pl. Obj. at 20 n.19. Similarly, Plaintiffs' claims for secondary liability under Section 20 of the Exchange Act are viable only if they establish primary liability. *See id.* Accordingly, Plaintiffs' objections with respect to their Section 9 and Section 20 claims are OVERRULED.

### E. Leave to Amend

Plaintiffs object to Judge Netburn's implicit denial of leave to amend their complaint, arguing that "leave to amend should be freely granted," especially in the context of securities litigation and "especially where dismissal of the complaint was based on Rule 9(b)." *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 271 (2d Cir. 1996) (brackets and internal quotation marks omitted). This objection is reviewed for clear error because these arguments were presented to Judge Netburn. *See* Pl. Opp., ECF No. 114, at 50 n.35. Plaintiffs have not established clear error. "[A]n amendment is not warranted absent some indication as to what [plaintiffs] might add to their complaint in order to make it viable." *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) (brackets and internal quotation marks omitted). Although the R&R made them aware of the potential deficiencies in their complaint, Plaintiffs have provided no such indication. Accordingly, Plaintiffs' objection to the denial of leave to amend is OVERRULED.

## CONCLUSION

The Court has reviewed *de novo* those portions of the R&R to which Plaintiffs properly object and has reviewed the remainder of the R&R for clear error.[6] For the reasons stated above, the Court ADOPTS the R&R in its entirety.

The Clerk of Court is directed to terminate the motions in Case No. 18 Civ. 2268 at ECF Nos. 101 and 105, and to close Case No. 18 Civ. 2268, Case No. 18 Civ. 2319, and Case No. 18 Civ. 4045.

SO ORDERED.

Dated: September 25, 2019
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[6] To the extent not discussed above, the Court finds no clear error in the unchallenged portions of the R&R.